58 P.3d 1242

**STATE of Hawai'i, Plaintiff–Appellee–Respondent,**

v.

**Arthur Corla LOCQUIAO, Defendant–Appellant–Petitioner.**

No. 23706.

Supreme Court of Hawai'i.

Dec. 9, 2002.

Edwin Lauder Baker, Honolulu, on the briefs, for the defendant-appellant-petitioner, Arthur Corla Locquiao.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellee-respondent, State of Hawai'i.

LEVINSON, NAKAYAMA, and ACOBA, JJ.; and RAMIL, J., dissenting, with whom MOON, C.J., joins.

Opinion of the Court by LEVINSON, J.

We granted the defendant-appellant-petitioner Arthur Corla Locquiao's application for a writ of certiorari in order to review the

published opinion of the Intermediate Court of Appeals (ICA) in *State v. Locquiao,* 100 Haw. 314, 59 P.3d 949 (App.2002) [hereinafter, "the ICA's opinion"]. The ICA's opinion affirmed the judgment of the first circuit court [1] convicting Locquiao of and sentencing him for the offenses of promoting a dangerous drug in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1243 (Supp.2001),[2] and unlawful use of drug paraphernalia, in violation of HRS § 329–43.5(a) (1993).[3]

In his application, Locquiao contends that the ICA's opinion contains two grave errors of law. First, Locquiao argues that the ICA erroneously held that the circuit court correctly found that the actions of Young Soo Kim, a government informant, were outside the scope of his government contract and that he was, therefore, acting as a private citizen when he detained and searched Locquiao at a local pool hall. Second, Locquiao asserts that the ICA erroneously held that the circuit court's refusal to instruct the jury on the ignorance-or-mistake-of-fact defense, pursuant to HRS § 702–218 (1993),[4] was

harmless error in light of the circuit court expressly instructing the jury that, in order to convict Locquiao, it must find that he acted "knowingly" in connection with the events with which he was charged.

We agree with Locquiao that the ICA reached an erroneous result with respect to the circuit court's refusal to instruct the jury regarding the ignorance-or-mistake-of-fact defense. In contrast to the ICA's opinion, we hold that, inasmuch as Locquiao adduced sufficient evidence at trial to warrant an ignorance-or-mistake-of-fact instruction, the circuit court's refusal so to instruct was not harmless beyond a reasonable doubt. In addition, although we agree with the ICA's holding that the circuit court correctly found that Kim's actions were outside the scope of his government contract at the time of Locquiao's arrest and that he was, therefore, acting as a private citizen when he detained and searched Locquiao, we wish to elaborate on the ICA's analysis regarding this matter. Accordingly, we (1) reverse the ICA's opinion with respect to its holding that the circuit court's refusal to instruct the jury on the ignorance-or-mistake-of-fact defense was

---

1. The Honorable Victoria S. Marks presided over both Locquiao's motion to suppress items of evidence and trial in the present matter.

2. HRS § 712–1243 provides:
 **Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.
 (2) Promoting a dangerous drug in the third degree is a class C felony.
 (3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

3. HRS § 329–43.5(a) provides:
 **Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or

to possess with the intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–600 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

4. HRS § 702–218 provides:
 **Ignorance or mistake as a defense.** In any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if:
 (1) The ignorance or mistake negatives the state of mind required to establish an element of the offense; or
 (2) The law defining the offense or a law related thereto provides that the state of mind established by such ignorance or mistake constitutes a defense.

harmless error, (2) leave undisturbed the ICA's holding that the circuit court correctly found that Kim was not acting as an agent for the government when he detained and searched Locquiao, (3) vacate the circuit court's judgment of conviction and sentence, and (4) remand this matter for a new trial.

## I. RELEVANT BACKGROUND

On January 19, 1999, Locquiao entered Kalihi Cue, a local pool hall owned by Young Soo Kim, and walked directly into the single-stall restroom located in the rear of the establishment. At the time, Kim recognized Locquiao from two previous incidents wherein he requested that Locquiao leave the pool hall and never return, after several customers had complained that he was remaining in the restroom for a suspiciously long duration of time. Concerned that Locquiao was engaging in illegal activity inside the restroom, Kim followed him and knocked on the door, which had been locked by Locquiao, and demanded that he open the door. Locquiao thereafter complied with Kim's request, at which point Kim apparently observed him attempting to hide an object in his pocket.[5] Kim immediately pulled Locquiao's hand out of his pocket and recovered a glass pipe. Kim testified that the glass pipe contained a solid white substance.

Kim thereafter detained Locquiao while an employee called the police. At approximately 11:00 a.m., Honolulu Police Department (HPD) Officers Roland Turner and Michael Tiwanak arrived at Kalihi Cue. Officer Turner retrieved the pipe from Kim and, based upon his expertise in identifying drugs and drug paraphernalia, immediately ascertained that the object was an "ice pipe" that seemed to contain drug residue. Officer Turner subsequently arrested Locquiao.

### A. Motion To Suppress

On February 3, 2000, an Oʻahu Grand Jury indicted Locquiao, charging him with promoting a dangerous drug in the third degree (Count I), see supra note 2, and unlawful use of drug paraphernalia (Count II), see supra note 3. On May 22, 2000, Locquiao filed a motion to suppress items of evidence [hereinafter, "motion to suppress"], arguing, inter alia, that Kim, a confidential informant for both the HPD and the Federal Drug Enforcement Administration (DEA), violated his rights as guaranteed by the fourth amendment to the United States Constitution and article 1, section 7 of the Hawaiʻi Constitution,[6] when he detained and searched Locquiao in the restroom of Kalihi Cue without a warrant. On May 31, 2000, the prosecution filed its opposition to Locquiao's motion to suppress, countering that, although Kim had previously been recruited by the HPD to act as an informant, under the totality of the circumstances, his actions in connection with Locquiao's arrest were as a private citizen and not as an arm of the government. As such, the prosecution contended that the evidence seized by Kim—i.e., the "ice pipe" containing methamphetamine residue—was not subject to the exclusionary rule.

The following relevant evidence was adduced at a hearing on Locquiao's motion to

---

**5.** Kim testified that there was only one door from which patrons could enter/exit the pool hall's restroom. Kim also observed that Locquiao was alone in the restroom.

**6.** The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, section 7 of the Hawaiʻi Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

suppress, conducted on June 2, 2000. On October 4, 1996, Kim, who had been arrested for promotion of a dangerous drug in the first degree, entered into a plea agreement with the Office of the Prosecuting Attorney to act as an informant for the HPD.[7] Kim's plea agreement expressly required him actively to assist the law enforcement agencies in any narcotics investigation and to remain in contact with HPD Officer Michael Rehfeldt [8] on a regular basis (approximately two to three times per week). Officer Rehfeldt testified that the plea agreement prohibited Kim from initiating any narcotics investigations on his own; in the event that Kim received information regarding a potential drug transaction, the terms of his plea agreement mandated that he first contact Officer Rehfeldt prior to taking any further action on behalf of the HPD or the DEA.

Officer Rehfeldt characterized Kim as an "outstanding informant," who diligently complied with the terms of his plea agreement and assisted in more than fifty arrests between October 1996 and October 1998. Several months prior to the January 19, 1999 incident, however, Kim informed Officer Rehfeldt that he had decided to purchase Kalihi Cue. Officer Rehfeldt discouraged Kim from engaging in such a business venture— pool halls tending to attract people involved with drugs and other illicit activities—because it might jeopardize his plea agreement.[9] Kim nevertheless acquired Kalihi Cue.

Approximately one month prior to the January 19, 1999 incident, Kim terminated all contact with Officer Rehfeldt. Officer Rehfeldt attempted to contact Kim numerous times but was unable to contact him until early February, after he had learned from HPD Detective Michael Hall that Kalihi Cue had been closed due to illegal gambling activity. At that time, Kim briefly mentioned to Officer Rehfeldt that he had detained a man at the pool hall for allegedly smoking drugs in the restroom. Officer Rehfeldt testified that he was not involved in Locquiao's arrest, that Kim had acted "strictly on his own," and that Kim had neither requested nor received any monetary benefit from the HPD or the DEA for his participation in apprehending Locquiao at Kalihi Cue.[10] Officer Rehfeldt explained that Kim's involvement with the HPD and DEA as an informant had focused solely on large-scale drug operations and, thus, that Locquiao's arrest was not the type of drug transaction that Kim's plea agreement had contemplated. Moreover, HPD Officers Turner and Tiwanak testified that, on January 19, 1999, Kim never mentioned to them that he was an informant for the HPD or the DEA.

In addition, Kim testified that his involvement in official HPD and DEA investigations as an informant was wholly independent of and unrelated to his role in Locquiao's detention and subsequent arrest at Kalihi Cue, in which episode he insisted that he had voluntarily participated "as an American citizen." Based on Officer Rehfeldt's knowledge of Kim's anticipated arrest for illegal gambling activity at Kalihi Cue, he notified the Office of the Prosecuting Attorney and the DEA that Kim had violated his plea agreement. Kim was subsequently sentenced to an indeterminate maximum twenty-year prison term, subject to a mandatory minimum sentence of one year; his sentence commenced on July 30, 2000.

7. Kim subsequently entered into a collateral agreement with the DEA to act as an informant and assist in drug investigations conducted by the federal government.

8. At the time of trial, Officer Rehfeldt was employed by the HPD but was assigned to the DEA as a task force officer.

9. By entering into the plea agreement, Kim expressly agreed "not to commit any crime or crimes during the pendency of [his] agreement other than those which inhere in the activity engaged in during the investigation by the [HPD]."

10. Although Kim had not received any monetary compensation for his involvement in the present matter, Kim had previously been compensated for his work as an informant for the HPD and DEA. Generally, Kim's compensation included out-of-pocket expenses, but, on one occasion, the DEA paid him $1,000.00 for rent and living expenses, because he was unemployed at the time.

After hearing argument by counsel, the circuit court denied Locquiao's motion to suppress, ruling as follows:

> Based on all of the evidence that's been presented[, the] court is going to deny the motion. [The] court finds that Mr. Kim was acting as a private citizen. Although he was an informant for the government, this matter basically was outside the scope of his contract[,] if you will[,] or his understanding with the government, that this matter was not at the instruction of the government, that[,] in fact[,] Detective Rayfeld [sic] learned of this situation through another detective, not even through [Mr. Kim] ..., and that Mr. Kim, the witness, had not mentioned to any police officer on the scene ... that he was an informant. . . .
>
> And[,] in fact[,] based on Mr. Kim's testimony[,] there was no privacy interest invaded in light of the fact that [Locquiao] opened the door to the bathroom, that Mr. Kim did not even use the key to open the bathroom door. So for those reasons[,] the motion [is] denied.

B. *Jury Instructions*

Locquiao's jury trial commenced on June 27, 2000, during which Locquiao testified on his own behalf regarding the events that occurred at Kalihi Cue on January 19, 1999. Specifically, Locquiao testified that an unidentified man [11] approached him at Kalihi Cue and inquired as to whether he would be interested in observing him demonstrate how to light a "glass material" object. Locquiao followed the man into the restroom and observed him light the "glass material," but they were interrupted when Kim opened the restroom door. The unidentified man became nervous, handed Locquiao the "glass material," and immediately exited the bathroom. As Locquiao followed the man out of the restroom, he placed the "glass material" inside his pant pocket. Within seconds, Kim

retrieved the "glass material" from his pocket and demanded that Locquiao follow him outside the restroom area. Locquiao testified that he was unaware that the "glass material" was, in fact, an illegal "ice pipe." He further testified that he had never seen an "ice pipe" prior to the incident at Kalihi Cue.

Based on the foregoing testimony, Locquiao's defense counsel argued that, inasmuch as the record reflected that Locquiao was ignorant of the "glass material's" nature, the circuit court should instruct the jury regarding the ignorance-or-mistake-of-fact defense. Specifically, defense counsel proposed the following instruction, citing HRS § 702-218(1), *see supra* note 4:

> In any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if the ignorance or mistake negatives the state of mind' required to establish an element of the offense.

The circuit court, over defense counsel's objection, refused the proposed jury instruction without explanation.

C. *Jury Verdict And Locquiao's Appeal*

On June 29, 2000, the jury returned a guilty verdict as to all counts. On July 14, 2000, the circuit court sentenced Locquiao to an indeterminate maximum five-year prison term, subject to a mandatory minimum of two years, in connection with the offense of promoting a dangerous drug in the third degree (Count I) and an indeterminate five-year prison term in connection with the offense of unlawful use of drug paraphernalia (Count II), the two terms to run concurrently. On August 29, 2000, Locquiao filed a timely notice of appeal.

As we have indicated, Locquiao asserted, *inter alia*, that the circuit court erred in denying his motion to suppress, inasmuch as, under the totality of the circumstances, Kim

11. Locquiao testified that he had never met the man who handed him the "glass material" prior to January 19, 1999. Although he acknowledged that, as of the time of trial, he knew the man's name, he refused to disclose it.

**202**

acted as an agent of the HPD and DEA, thereby violating his right to be free from unreasonable searches and seizures as guaranteed by the fourth amendment to the United States Constitution and article 1, section 7 of the Hawai'i Constitution, *see supra* note 6. Locquiao specifically argued that, because Kim was still bound to the terms of his plea agreement at the time of his arrest, which agreement expressly required Kim to provide "total knowledge, whether solicited or not, and to actively assist the police," Kim was an agent of the police and, thus, bound by the same constitutional strictures as the government when he searched and detained him.

Locquiao also argued that the circuit court erred in refusing to instruct the jury on the ignorance-or-mistake-of-fact defense, pursuant to HRS § 702–218(1), *see supra* note 4, inasmuch as evidence was adduced at trial that he was ignorant as to the "glass material's" nature and that such ignorance would have negated the states of mind requisite to the charged offenses. Locquiao essentially contended that a reasonable juror could have concluded that his ignorance constituted an honest mistake, the legislature having relatively recently enacted the drug paraphernalia law and there having been no direct evidence adduced at trial that he was aware that the pipe contained a controlled substance. By failing to so instruct, Locquiao maintained that the circuit court had, in effect, relieved the prosecution of its burden to disprove a non-affirmative defense beyond a reasonable doubt.

The ICA's opinion held, *inter alia*, that the circuit court correctly ruled that Kim's conduct at the Kalihi Cue occurring on January 19, 1999 fell outside the scope of his contract with the government and that, although Kim may previously have been recruited by the HPD, he acted as a private citizen in the present matter and not as an arm of the government. The ICA's opinion further held that, although Locquiao's testimony at trial supported a jury instruction on the ignorance-or-mistake-of-fact defense, the circuit court's error in refusing the instruction was

harmless beyond a reasonable doubt. The ICA opined that the elements of the ignorance-or-mistake-of-fact defense, denominated by the ICA as a "flip-side" defense, were subsumed within the circuit court's substantive instructions. Consequently, the ICA concluded that, viewing the record as a whole, the circuit court's "error in refusing to give the flip-side defense instruction [was] harmless beyond a reasonable doubt," inasmuch as there was no reasonable possibility that the error might have contributed to Locquiao's conviction. *Id.* Specifically, the ICA noted that:

> the jury was instructed that Count I required proof beyond a reasonable doubt that Locquiao knowingly possessed methamphetamine and that Count II required proof beyond a reasonable doubt that Locquiao knowingly possessed drug paraphernalia with intent to use it to ingest, inhale, or otherwise introduce methamphetamine into his body. Consequently, if the jury believed Locquiao's testimony that he did not know that the "glass material" allegedly handed to him by the other man was an "ice pipe" or that it contained methamphetamine, the jury would have found that Locquiao did not "knowingly" possess methamphetamine and that he did not "knowingly" possess the "glass material" with the "intent" to use it to ingest, inhale, or otherwise introduce methamphetamine into his body and would have found him not guilty.

*Id.* at 320, 59 P.3d at 955. In other words, by finding Locquiao guilty of the charged offenses, the jury, of necessity, must have found that he knew that the "glass material" was illegal drug paraphernalia and that it contained methamphetamine.

## II. STANDARDS OF REVIEW

### A. *Certiorari From The Intermediate Court Of Appeals*

Appeals from the ICA are governed by HRS § 602–59(b) (1993), which provides that an "application for writ of certiorari shall tersely state its grounds which must include

(1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the intermediate court with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal."

### B. *Findings Of Fact/Conclusions Of Law*

 We review a circuit court's findings of fact in a pretrial ruling according to the following standard:

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citations and internal quotation marks omitted). "The circuit court's conclusions of law are reviewed under the right/wrong standard." *State v. Pattioay*, 78 Hawai'i 455, 459, 896 P.2d 911, 915 (1995) (citation omitted).

*State v. Wilson*, 92 Hawai'i 45, 48, 987 P.2d 268, 271 (1999).

*State v. Harada*, 98 Hawai'i 18, 22, 41 P.3d 174, 178 (2002).

### C. *Motion To Suppress*

 "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points omitted). Accordingly, "[w]e review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right' or 'wrong.'" *Id.* (citations and some quotation signals omitted).

*State v. Poaipuni*, 98 Hawai'i 387, 392, 49 P.3d 353, 358 (2002).

### D. *Harmless Error Within The Context Of Jury Instructions*

 We review the circuit court's jury instructions to determine whether, "when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *State v. Valentine*, 93 Hawai'i 199, 203, 998 P.2d 479, 483 (2000) (citations and internal quotations signals omitted).

> [E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*Id.* (citations and internal quotation marks omitted).

*State v. Hironaka*, 99 Hawai'i 198, 204, 53 P.3d 806, 812 (2002).

### III. *DISCUSSION*

A. *The ICA Did Not Gravely Err In Holding That The Circuit Court Correctly Found That Kim Acted Outside The Scope Of His Government Contract And That He Was, Therefore, Acting As A Private Citizen When He Detained And Searched Locquiao.*

 In his application, Locquiao argues that the ICA's opinion gravely erred in its

analysis of the circuit court's finding that Kim was not acting as an arm of the government when he detained and searched Locquiao at Kalihi Cue on January 19, 1999. Relying on this Court's decisions in *State v. Kahoonei*, 83 Hawai'i 124, 925 P.2d 294 (1996), and *State v. Boynton*, 58 Haw. 530, 574 P.2d 1330 (1978), Locquiao contends that the ICA erred in failing to apply the totality-of-the-circumstances test and the factors enumerated in *Boynton* to the present matter, instead focusing solely on the express terms of Kim's plea agreement with the HPD and the DEA as the basis for its holding. Locquiao asserts that, under the totality of the circumstances, Kim was an agent of the government and, therefore, was subject to the constraints of the fourth amendment to the United States Constitution and article 1, section 7 of the Hawai'i Constitution, *see supra* note 6.

Moreover, Locquiao argues that the ICA erroneously held that his "factual assertions [were] not supported by the record." Specifically, Locquiao contends that, at the time of his arrest, it was undisputed that Kim was bound by an open-ended plea agreement with the HPD, which required him to disclose his "total knowledge, whether solicited or not," regarding drug activity in Hawai'i and to "actively assist the police" in its investigations. The plea agreement expressly required Kim regularly to contact Officer Rehfeldt and prohibited him from engaging in any further criminal activity; any violation of the plea agreement constituted a material breach and warranted revocation of the agreement in its entirety. Locquiao further asserts that, although *Kahoonei* suggests that the subjective motivation of a private party may not be germane to determining whether the person acted as an agent of the police, Kim's motivation was nevertheless relevant to refute his claim that he acted "voluntarily as an American Citizen." As such, Locquiao maintains that the ICA's opinion is erroneous as a matter of both fact and law.

It is a longstanding rule in Hawai'i that "where a search is physically con-

ducted by a private individual but only at [the] government's initiation and under their guidance[,] it is not a private search." *Boynton*, 58 Haw. at 536, 574 P.2d at 1334; *see also State v. Furuyama*, 64 Haw. 109, 120, 637 P.2d 1095, 1102 (1981) (holding that, where individuals were "not mere bystanders ... [but] active members of a police-directed, if not inspired, joint effort to gather evidence[,]" there was no basis upon which to review their "deeds as essentially private action"). Moreover, "where civilians 'act as agents of the police[,] ... the full panoply of constitutional provisions and curative measures applies.'" *Boynton*, 58 Haw. at 536, 574 P.2d at 1334 (quoting *People v. Esposito*, 37 N.Y.2d 156, 371 N.Y.S.2d 681, 332 N.E.2d 863, 866 (1975)).

In determining whether government involvement in a particular instance is "significant or extensive enough to render an otherwise private individual a mere arm, tool, or instrumentality of the state," we have held that courts must examine the totality of the circumstances. *Kahoonei*, 83 Hawai'i at 130, 925 P.2d at 300. Further to the foregoing determination, this court has delineated several factors to be considered, which include whether the private individual: (1) was actively recruited by a governmental agency to assist in its investigations; (2) was directed by a government agent; (3) acted for a private purpose; and (4) received any payment for his or her services. *Id.* at 127, 925 P.2d at 297 (citing *Boynton*, 58 Haw. at 537–38, 574 P.2d at 1335 (holding that, inasmuch as the informant was involved in a "symbiotic relationship" with the police, had been actively recruited and compensated by the police for the information, the informant was a government agent for fourth amendment purposes)); *cf. State v. Sanford*, 97 Hawai'i 247, 254, 35 P.3d 764, 771 (App.) (holding that the search and seizure at issue was immune from constitutional scrutiny, because the informant conducted a purely private search without direction or encouragement from law enforcement and without compensation for his apprehension of the defendant), *cert. denied*, 97 Hawai'i 247, 35 P.3d 764 (2001).

Applying the *Boynton* factors to the present matter, we agree with the ICA's opinion that Kim's actions in detaining and searching

Locquiao were private in nature and, therefore, immune from constitutional scrutiny. First, although Kim had been actively recruited by the HPD to act as an informant, he was in material breach of his plea agreement at the time of Locquiao's arrest. Specifically, Officer Rehfeldt testified at the hearing on Locquiao's motion to suppress and at trial that Kim had terminated all contact with him, in violation of paragraph 2 of the plea agreement. In fact, it was not until February 1999 that Officer Rehfeldt finally spoke with Kim regarding the gambling raid at Kalihi Cue, at which time Kim also informed him that he had assisted in the arrest of a man for allegedly smoking drugs in the pool hall's restroom; Kim, however, never specifically referred to Locquiao by name during his conversation with Officer Rehfeldt. Thus, on the record before us, it is simply not possible that Kim's detention and search of Locquiao was directed by a government agent pursuant to Kim's plea agreement. In this connection, and second, Officers Turner and Tiwanak testified that, during the January 19, 1999 incident, Kim never disclosed to them that he was a government informant. Third, Kim received no compensation for his participation in Locquiao's arrest. Finally, Kim expressly testified that he acted "as an American citizen" when he detained and searched Locquiao at Kalihi Cue and that Locquiao's arrest was unrelated to his participation as an informant in official HPD and DEA investigations.

Thus, based on the totality of the foregoing circumstances, we hold that the ICA did not gravely err in holding that Kim was acting as a private citizen in connection with the events with which Locquiao was charged and that, therefore, his search and/or seizure of Locquiao was not constrained by the fourth amendment to the United States Constitution and article 1, section 7 of the Hawaiʻi Constitution, *see supra* note 6.

B. *The ICA Wrongly Held That The Circuit Court's Error In Refusing To Instruct The Jury On The Ignorance–Or–Mistake–Of–Fact Defense Was Harmless Beyond A Reasonable Doubt.*

Locquiao contends that the ICA's opinion gravely errs in holding that the circuit court's refusal to instruct the jury on the ignorance-or-mistake-of-fact defense—otherwise innovatively referred to by the ICA as the "flip-side" defense—set forth in HRS § 702–218(1), *see supra* note 4, was harmless error. Locquiao argues that, although the ICA correctly held that he was entitled to an instruction on the ignorance-or-mistake-of-fact defense—because he testified at trial that he was unaware that the "glass material" was an "ice pipe," the ICA incorrectly held that the circuit court's error in refusing to give the instruction was harmless beyond a reasonable doubt merely because the jury was instructed that, in order to find him guilty of the charged offenses, it must find that he acted "knowingly." Locquiao maintains that the ICA's holding would invariably render the erroneous failure to give an ignorance-or-mistake-of-fact defense instruction harmless, so long as the circuit court otherwise sufficiently instructed the jury as to the prosecution's burden of proving the requisite state of mind beyond a reasonable doubt. We agree with Locquiao.

This court has consistently held that " 'a defendant is entitled to an instruction on every defense or theory of defense having any support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be.' " *See, e.g., Hironaka*, 99 Hawaiʻi at 204, 53 P.3d at 812 (quoting *State v. Maelega*, 80 Hawaiʻi 172, 178–79, 907 P.2d 758, 764–65 (1995)). Moreover, it is the trial judge's duty to insure that the jury instructions cogently explain the law applicable to the facts of the case and that " 'the jury has proper guidance in its consideration of the issues before it.' " *State v. Robinson*, 82 Hawaiʻi 304, 311–12, 922 P.2d 358, 365–66 (1996) (quoting *State v. Nakamura*, 65 Haw. 74, 79, 648 P.2d 183, 187 (1982)), *overruled on other grounds by State v. Tafoya*, 91 Hawaiʻi 261, 982 P.2d 890 (1999). "Thus, on review, we must ascertain whether the jury instructions given by the circuit court, 'when read and considered as a whole, ... are prejudicially insufficient, erroneous, inconsistent, or misleading.' " *Hiro-*

*naka,* 99 Hawai'i at 204, 53 P.3d at 812 (quoting *State v. Valentine,* 93 Hawai'i 199, 203, 998 P.2d 479, 483 (2000)). Erroneous instructions are presumptively harmful and are a ground for reversal unless "the prosecution satisfie[s] its burden of showing that the erroneous instructions were harmless beyond a reasonable doubt." *State v. Smith,* 91 Hawai'i 450, 462, 984 P.2d 1276, 1288 (App.), *cert. denied,* 92 Hawai'i 632, 994 P.2d 564 (1999).

Pursuant to HRS § 702–204 (1993), "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." "The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) result of conduct" that are "specified by the definition of the offense" and that "[n]egative a defense." *See* HRS § 702–205 (1993). With respect to defenses that negate penal liability, the defendant has the initial burden to adduce "credible evidence of facts constituting the defenses, unless ... those facts are supplied by the prosecution's witnesses." *See* Commentary to HRS § 701–115 (1993). If the defendant raises an affirmative defense, he or she must prove the elements of the defense by a preponderance of the evidence. *See* HRS § 701–115(2)(b) (1993). By contrast, if the defendant raises a non-affirmative defense, the prosecution must prove beyond a reasonable doubt facts negating the defense. *See* HRS §§ 701–115(2)(a) and 702–205(b); *see also State v. Jones,* 96 Hawai'i 161, 168, 29 P.3d 351, 358 (2001) ("[W]here ... the jury has been given instructions on a defense other than an affirmative defense, but has not been instructed that the prosecution bears the burden of proof beyond a reasonable doubt with respect to negativing that defense, substantial rights of the defendant may be affected ....' " (quoting *Raines v. State,* 79 Hawai'i 219, 225, 900 P.2d 1286, 1292 (1995))).

In the present matter, Locquiao was charged with promoting a dangerous drug in the third degree (Count I), in violation of HRS § 712–1243, and unlawful possession of drug paraphernalia (Count II), in violation of HRS § 329–43.5(a), *see supra* notes 2 and 3. Accordingly, the prosecution bore the burden of proving beyond a reasonable doubt, as to Count I, that Locquiao "knowingly" possessed methamphetamine in any amount and, as to Count II, that he "knowingly" used or possessed drug paraphernalia with the intent to use it to ingest, inhale, or otherwise introduce a controlled substance into the human body. Moreover, Locquiao's sole defense at trial was that he was unaware that the "glass material" recovered by Kim was an "ice pipe" and that the "glass material" contained methamphetamine. That being so, Locquiao was entitled to an instruction on the ignorance-or-mistake-of-fact defense, and the prosecution bore the burden of disproving the defense— it being an element of its case-in-chief— beyond a reasonable doubt. *See* HRS § 701–115(2)(a). The novel question presently before this court is whether the circuit court's erroneous failure separately to instruct the jury as to Locquiao's ignorance-or-mistake-of-fact defense was harmless, inasmuch as the defense was essentially subsumed within the circuit court's substantive instructions regarding the requisite state-of-mind element.

We recognize that there is a split in authority with respect to the issue. On the one hand, a number of jurisdictions have held that it is unnecessary separately to instruct the jury as to the ignorance-or-mistake-of-fact defense, where the substance of the defense is sufficiently covered by the requisite state-of-mind element of the charged offense. *See State v. Silveira,* 198 Conn. 454, 503 A.2d 599, 604 (1986) ("The defendant's claim, although fashioned in terms of mistake of fact, is in reality nothing more than a denial of the intent to cause serious physical injury required for conviction.... Because this is not a 'legally recognized defense' under our law, the trial court did not err in denying his request to charge on mistake of fact...."); *State v. Molin,* 288 N.W.2d 232, 234 (Minn. 1979) (holding that, although a defendant is entitled to an instruction on his theory of the case when supported by the evidence, " '[t]he

court need not give the instruction as requested by the [defendant] if it determines that the substance of that request is contained in the court's charge.' "); *Hooper v. State,* 95 Nev. 924, 604 P.2d 115, 116 (1979) (holding that the trial court did not err in refusing to give a mistake-of-fact instruction "when the law encompassed therein is substantially covered by other instructions given to the jury"); *State v. Nieto,* 129 N.M. 688, 12 P.3d 442, 447 (N.M.2000) ("[T]he trial court need not give a mistake [-]of[-]fact instruction 'where the intent element of the crime is adequately defined by the other instructions given by the trial court.' "); *State v. Tevay,* 707 A.2d 700, 702 (R.I.1998) (holding that, by instructing the jury that it must find that the defendant acted intentionally, the jury instructions, taken as a whole, adequately covered the defense of mistake of fact); *State v. Johnston,* 478 N.W.2d 281, 283 (S.D.1991) (" '[W]henever an intent instruction involving the defendant's mental state is given, the mistake[-]of[-]fact concept is automatically included and does not merit a separate instruction.' ") (quoting *State v. Griscom,* 101 N.M. 377, 683 P.2d 59, 61 (N.M.App.1984)); *Sands v. State,* 64 S.W.3d 488, 495–96 (Tex.App.2001) (holding that the failure to submit a mistake-of-fact instruction was harmless error, inasmuch as the jury, in deciding whether the defendant intentionally and knowingly possessed methamphetamine, considered the defendant's theory of the case).

On the other hand, a respectable group of jurisdictions has held that the trial court must separately instruct the jury as to the ignorance-or-mistake-of-fact defense, when properly raised, in order to draw the jury's attention to the defendant's theory of the case. For example, in *People v. Crane,* 145 Ill.2d 520, 165 Ill.Dec. 703, 585 N.E.2d 99, 102 (1991), the trial court refused to give a mistake-of-fact instruction on the basis that the standard jury instructions adequately covered the requisite state of mind for the charged offense. *Crane,* 165 Ill.Dec. 703, 585 N.E.2d at 102. On appeal, the Illinois Supreme Court held that the trial court's fail-

ure to give the requested instruction, which was supported by the evidence, was not harmless error:

> [t]his instruction, while sufficiently informing the jury of the mental state requirements, does not expressly draw the jury's attention to the concept of mistake of fact. Since Illinois recognizes the defense of mistake of fact, when this defense is supported by the evidence[,] it is not sufficient to merely inform the jury of the mental state requirements, but it must also be informed of the validity of the mistake[-]of[-]fact defense.

*Id.* Likewise, the Iowa Supreme Court rejected the contention that the state-of-mind instruction adequately addressed a defendant's mistake-of-fact defense. *State v. Freeman,* 267 N.W.2d 69, 71 (Iowa 1978).

> It is true [that] a mistake of fact would, under its definition, make it impossible for [a] defendant to form a criminal intent.

> Mistake of fact[,] nevertheless[,] remains a separate and distinct issue notwithstanding its relation to the State's duty to prove a criminal intent. Mistake of fact was defendant's sole and only theory of defense. It did not vanish merely because it can be stated [that] the mistake could not coexist with a criminal intent.

*Id.; see also Adcock v. State,* 260 Ga. 302, 392 S.E.2d 886, 886 (1990) (holding that reversible error can occur from the failure to give a mistake-of-fact instruction, even if it is not the defendant's sole defense); *Jewell v. Commonwealth,* 549 S.W.2d 807, 812 (Ky. 1977) (explaining that the defense of mistake of fact, when raised, requires an instruction calling it to the jury's attention), *overruled on other grounds by Payne v. Commonwealth,* 623 S.W.2d 867 (Ky.1981); *Cheser v. Commonwealth,* 904 S.W.2d 239, 242–43 (Ky. Ct.App.1994) (holding that, where the defendant's conviction rests upon a charge as to which mistake of fact was a defense, failure to instruct the jury on the defense was not harmless error); *General v. State,* 367 Md. 475, 789 A.2d 102, 111 (2002) ("Were we to accept the State's argument that the instruc-

tion on intent and knowledge fairly covered the mistake[-]of[-]fact defense, there would never be an occasion to give the instruction."); *State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837, 847 (1998) ("We cannot agree with the State that an instruction regarding the substantive elements of the offense subsumes an instruction regarding Koperski's consent theory of defense. An instruction regarding the substantive elements of the offense alone fails to apprise the jury that an alleged victim's consent must be affirmatively and freely given...."); *Commonwealth v. Hamilton*, 766 A.2d 874, 880 (Pa.Super. 2001) (holding that the trial court's failure to instruct the jury as to the mistake-of-fact defense warranted a new trial); *Bang v. State*, 815 S.W.2d 838, 842 (Tex.App.1991) ("When an accused creates an issue of mistaken belief as to the culpable mental element of the offense, he is entitled to a defensive instruction on 'mistake of fact.' ").

It is noteworthy that several of the jurisdictions that require a separate mistake-of-fact instruction do so on the basis that there is a distinction between statutory and non-statutory defenses.[12] Specifically, the former mandates a separate instruction in order to adhere to the statutory framework upon which the defense was enacted. *See Anderson v. State*, 11 S.W.3d 369, 373 (Tex. App. 2000) (recognizing a distinction between statutory and nonstatutory defenses when determining whether a defendant is entitled to an instruction on the mistake-of-fact defense); *Bang*, 815 S.W.2d at 842 ("Because the Penal Code makes 'mistake of fact' a statutory defense, appellant was entitled to have the jury specifically rule upon the defense."); *Cheser*, 904 S.W.2d at 242 (reiterating that "the difference between the statutory defenses and a simple denial by the defendant that he committed one or more of the essential elements of the crime is that when a statutory defense is raised, it requires an instruction calling it to the attention of the jury").

The Hawai'i legislature premised the enactment of HRS § 702–218 on the proposi-

tion that, "if a person is ignorant or mistaken as to a matter of fact ..., the person's ignorance or mistake will, in appropriate circumstances, prevent the person from having the requisite culpability with respect to the fact ... as it actually exists...." *See* Commentary to HRS § 702–218 (1993). Consequently, the legislature intended that a jury consider, separate and apart from the substantive elements, whether a defendant's mistaken belief should negate the requisite culpability for the charged offense. That being the case, insofar as ignorance or mistake of fact is a statutory defense in Hawai'i, we deem the reasoning of the jurisdictions entitling the defendant to a separate instruction to be the more compelling and, thus, now hold that, where a defendant has adduced evidence at trial supporting an instruction on the statutory defense of ignorance or mistake of fact, the trial court must, at the defendant's request, separately instruct as to the defense, notwithstanding that the trial court has also instructed regarding the state of mind requisite to the charged offense. We believe that to hold otherwise would render HRS § 702–218(1) nugatory.

Inasmuch as the jury was not given the opportunity *expressly* and *separately* to consider Locquiao's defense of ignorance or mistake of fact at trial, "there is a reasonable possibility that [the circuit court's] error may have contributed to [Locquiao's] conviction." *See Hironaka*, 99 Hawai'i at 204, 53 P.3d at 812 (quoting *Valentine*, 93 Hawai'i at 203, 998 P.2d at 483). Thus, the ICA's opinion gravely erred in holding that the circuit court's error was harmless beyond a reasonable doubt.

## IV. CONCLUSION

Based on the foregoing reasoning, we (1) reverse the ICA's opinion with respect to its holding that the circuit court's refusal to instruct the jury on the ignorance-or-mistake-of-fact defense instruction was harmless error, (2) hold that, where a defendant has

---

**12.** We recognize, however, that ignorance or mistake of fact is a statutory defense in a majori-

ty of the jurisdictions on both sides of the present issue on appeal.

adduced evidence at trial to support an instruction on the statutory ignorance-or-mistake-of-fact defense, the trial court must, if the defendant so requests, separately instruct as to the defense, notwithstanding that the trial court has also instructed regarding the state of mind requisite to the charged offense, (3) leave undisturbed the ICA's holding that the circuit court correctly found that Kim was acting as a private citizen and not as an arm of the government when he detained and searched Locquiao at Kalihi Cue and, therefore, that Kim's conduct was not subject to constitutional scrutiny under the fourth amendment to the United States Constitution and article 1, section 7 of the Hawai'i Constitution, (4) vacate the circuit court's judgment of conviction and sentence, and (5) remand this matter for a new trial.

Dissenting Opinion by RAMIL, J., in Which MOON, C.J., joins.

I respectfully dissent from the majority's opinion because I believe the jury was adequately instructed in the present case.

The standard we apply in reviewing the adequacy of jury instructions is whether, "when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading[,]" *State v. Valentine*, 93 Hawai'i 199, 203, 998 P.2d 479, 483 (2000); the critical question being whether there is a reasonable possibility that the error may have contributed to the conviction. *Id.* The failure to give the mistake-of-fact instruction did not contribute to the conviction in this case since the jury was sufficiently instructed on the prosecution's burden of proving that Locquiao knowingly possessed methamphetamine. The ICA was correct in noting that "if the jury believed Locquiao's testimony that he did not know that the 'glass material' allegedly handed to him by the other man was an 'ice pipe' or that it contained methamphetamine, the jury would have found that Locquiao did not 'knowingly' possess methamphetamine" and would have found him not guilty. *State v. Locquiao*, 100 Haw. 314, 59 P.3d 949 (App. 2002). The court's failure to give the mis-

take-of-fact instruction is harmless because the jury found that the prosecution proved all the elements of the crime beyond a reasonable doubt. Even had the court instructed the jury on the mistake-of-fact defense, the jury's conclusion would be the same—*i.e.*, that Locquiao was not ignorant as to what the "glass material" was and that he possessed the requisite intent to be found guilty of the crime. *Cf. State v. Haanio*, 94 Hawai'i 405, 415–16, 16 P.3d 246, 256–57 (2001) (holding that the failure to give an included offense instruction is harmless where the defendant is found guilty of the greater offense because the prosecution proved the elements of the greater offense beyond a reasonable doubt).

Courts that have required the mistake-of-fact instruction base its necessity on the ground that the purpose of the instruction is to draw the jury's attention to the defendant's theory of the case and to inform the jury of the validity of the mistake-of-fact defense. *See* majority at 207–208, 58 P.3d at 1254–1255. In my view, it is unnecessary to point out non-affirmative defenses to the jury, which simply state that if the defendant can negate an element of the crime the jury must find him not guilty. Such an instruction is indistinguishable from one that requires the prosecution to prove all the elements of the crime beyond a reasonable doubt. Requiring such a duplicative instruction would not only be superfluous, but would also serve to confuse the jury since the mistake-of-fact defense is subsumed within the intent instruction.

Because I find no reversible error was committed in this case, I respectfully dissent. Accordingly, I would dismiss the certiorari proceeding as improvidently granted.