STATE OF HAWAI'I, Plaintiff-Appellee,
v.
RICHARD ELLSWICK, JR., Defendant-Appellant.
No. 28895.
Intermediate Court of Appeals of Hawaii.
December 31, 2008.
On the briefs:
Joseph R. Mottl, III, for Defendant-Appellant.
Brian R. Vincent, Deputy Prosecuting Attorney, City and County of Honolulu, for Plaintiff-Appellee.

MEMORANDUM OPINION
WATANABE, Presiding J., FOLEY, and FUJISE, JJ.
Defendant-Appellant Richard Ellswick, Jr. (Ellswick) appeals from the judgment entered by the Circuit Court of the First Circuit[1] (circuit court) on November 14, 2007, convicting and sentencing him for one count of unauthorized control of a propelled vehicle (UCPV) in violation of Hawaii Revised Statutes (HRS) § 708-836 (Supp. 2007) .
Ellswick contends that the circuit court erred in failing to give the jury: (1) a mistake-of-fact instruction, and (2) an instruction on the affirmative defense of authorization by an agent of the owner pursuant to HRS § 708-836 (3) (a) (Supp. 2007). We agree with Ellswick's first contention and accordingly, vacate the judgment and remand for a new trial.

BACKGROUND
On April 21, 2006, Ellswick was charged by complaint with one count of UCPV, as follows:
On or about the 13th day of March, 2006, to and including the 15th day of April, 2006, in the City and County of Honolulu, State of Hawaii, [Ellswick] did intentionally or knowingly exert unauthorized control over a propelled vehicle, by operating the vehicle without the consent of TLC Motorcycles Inc. [(TLC)] and/or Randall Wong [(Wong or Mr. Wong)], owner of said vehicle, thereby committing the offense of [UCPV], in violation of Section 708-836 of the Hawaii Revised Statutes.
Jury trial commenced on February 20, 2007.
Wong, the sole proprietor of TLC, a motorcycle repair shop, was the first witness called by the State of Hawai'i (State). Wong testified that in March 2006, he was moving his shop from Mapunapuna to Kane'ohe and had several people helping with the move, including Ellswick, an acquaintance of Wong's son, Gary. TLC owned two trucks, one of which was a 1983 Ford pick-up truck with a mechanized lift gate (TLC truck or truck) that Wong had allowed Ellswick to drive on "one or two occasions[.]"
Wong recalled that when he left work on March 13, 2006, Jack May (May) and Gary were still at the shop since "[t]hey would stay there overnight to get ready for the next day." Wong could not recall whether Ellswick. was at the shop[.] Wong stated that he is the only person authorized to permit use of the TLC truck and that he had apprised all of the helpers that if they wanted to use the truck, they should ask him first. Wong admitted, however, that he had not told Ellswick to ask for permission to use the truck because Wong "didn't feel [he] had to give [Ellswick] specific instructions. [Ellswick] never had any blanket permission to use the truck."
Wong stated that when he arrived at work on March 14, 2006, he noticed that the truck was missing and asked Gary and May if they knew what had happened to it. Neither knew what had happened to the truck. A day or two after the truck was known to be missing, Ellswick called and said that he had the truck but could not return it because it was overheating. Wong recalled Ellswick stating that "he had to do something, and he figured it would be all right to take [the truck], so he just took it." Wong thought he was clear in instructing Ellswick to bring the truck right back and since Ellswick "said he was going to bring it right back," Wong did not "prolong the conversation" by telling Ellswick that he should not have taken the truck.
About a week later, Wong testified, Ellswick telephoned again and said "he was going to bring the truck back, that he had taken it to his friend to have it repaired, [and] that he was going to bring it back right away." Wong told Ellswick to bring the truck right back, and although Ellswick promised to do so, he did not return the truck. Wong reported to the police that the truck was stolen on March 27, 2006. Wong testified that he did not make the police report earlier because he "kept hoping that [Ellswick] would just bring [the truck] back [.]"
Wong testified that he eventually got the truck back after May, "for some reason [,]... went up to the Rainbow Chevron service station to buy cigarettes or whatever," saw the truck there, and called Wong, who sent someone to pick up the truck. Wong stated that the truck then had "a very bad coolant leak" and "wouldn't start" so the truck had to be towed back to the TLC shop. Wong also remembered that during one of his conversations with Ellswick, Ellswick offered to buy the truck, and Wong considered the offer since he had "only bought the truck for the purpose of helping us move" and had planned to sell the truck "after the move was finished[.]"
May testified that he had worked for Wong since April 2003 and in March 2006, was assisting with the move of the TLC shop to Kane'ohe. May stated that it was his understanding that no one was allowed to take any property from the TLC premises without asking for permission from Wong. May testified that on March 13, 2006, after Wong left for the day, he, Gary, Ellswick, and some other person were at the shop. Gary and the other person "took one truck and left with it to go pick up some motorcycles or something" and the TLC truck "was still at the shop because it had a leaky water pump and it needed not to go anywhere.... [I]t wasn't running right." When Gary returned to the shop, the truck was not there and Gary asked May where it was. After Gary and May talked, they came to the conclusion that "maybe [Ellswick] had taken it[.]"
May further testified that in April 2006, he went to the Chevron station in Mapunapuna "to get a sandwich, soda, and a pack of cigarettes" and saw the truck
parked not at the pumps but up in, like, the parking area where they put vehicles they're going to work on, and the hood was up on it, the engine hood. And as I parked the bike I was on, I saw [Ellswick] come out of the store to go back to the truck. So I went in the store, asked to use their phone. I called back to the shop, told [Wong] that the truck is down here. He told me, Oh, okay. I told him, I'll go out there and talk to [Ellswick], see if I can get the keys out of the truck, and he told me he'd come down, so... I went back outside, went over to the truck because it looked like [Ellswick] was maybe putting water in the radiator or something to that effect. I think it was overheating. I said, Hey, what are you doing? And he proceeded to tell me he was bringing the truck back, but it was overheating. So I walked around to the front of it, looked at it. Yeah, it was overheating. Went over to the driver's side door, took the keys out of it, and pretty much waited for [Wong] to come down there. He came down, and I believe at that point he proceeded to call the police to report that we found it.
(Formatting adjusted.) The police came and arrested Ellswick. May stated that he did not give Ellswick permission to take the truck.
Honolulu Police Department Officer Michael Fujioka (Officer Fujioka) testified that on April 16, 2006, following Ellswick's arrest, he conducted a taped interview with Ellswick.
In the taped interview, which was played for the jury, Ellswick stated that on March 13, 2006, Wong left to go to his sister's wedding. Gary and another TLC employee left in Gary's car to pick up a motorcycle, but on the way back, the car ran out of gas. Gary gave Ellswick the keys to the truck and told him and the other employee to bring gas for the car and then bring the car back; they did that. As Gary and the other employee left the shop, Gary asked Ellswick to watch over the shop. Later, Gary's friend arrived at the shop, and, after working on his motorcycle, asked Ellswick for a ride home. Ellswick stated that he tried calling Gary and Wong for instructions but could not get in touch with either one. He, therefore, took it upon himself to use the truck to give Gary's friend a ride home. On the way back, the truck overheated, so he called a friend to look at the cruck. The friend said the truck had a water-pump problem, so Ellswick gave the friend $100 to repair the water pump. Ellswick said he notified Gary about the truck's situation, and Gary told him to bring the truck back quickly. Ellswick said he kept calling his friend, but when the truck remained unrepaired, Ellswick took it back. He got the truck started, then the engine died, but with the truck's momentum, he was able to get the truck to the Chevron station in Mapunapuna. It was there that Ellswick saw May and told May to let Wong know that he was bringing the truck back. Ellswick testified that he was embarrassed about having the truck for so long and just wanted to get it fixed and returned to the TLC shop. He said because the truck overheated while he was driving it, he felt a responsibility to repair it before returning it. His friend took his money but did not fix the truck. The friend was apparently also using the truck, and Ellswick did not want to tell Wong that. Ellswick assumed that Wong and Gary were angry. Ellswick stated that he knew he was using the truck without Wong's permission. Ellswick also admitted that he stayed in the truck overnight for a few nights rather than drive home to `Ewa Beach. On questioning by Officer Fujioka, Ellswick was unable to state the last name of the friend whom Ellswick had left the truck with to be repaired.
On direct examination, Ellswick testified that on the day he took the truck, Wong announced at about lunchtime that he was going to his sister's wedding and "that Gary was going to be in charge[.]" Later that evening, Ellswick said:
Gary and another employee, John, they went to go pick up a motorcycle, and coming back their car runs out of gas on H-3. They come back to the shop. Gary had something to do, so he tells me and John take the truck, go get gas, go get the car. So we did that. We came back to the shop. And the truck was acting up a little. It was overheating or whatever. It wasn't seriously breaking down yet.
Okay. Gary leaves with John on some kind of business, and Gary  I remember this distinctly  turns around walking out the gate, hands me the keys, [Ellswick], keep an eye on the shop. I'm there by myself, so I'm assuming that I'm in charge of the shop, the supervisor or the acting intern employee that's in charge of the business.
One of their friends  one of Gary's friends shows up looking for his motorcycle. They were supposed to have repaired it that day. I told the guy, Mr. Wong's not here. Gary left. I don't know when they're coming back. And he says, Well, there's my bike. Let me go see if it starts. He goes. It doesn't start. But, anyway, the point is we tried calling Gary. We tried calling Mr. Wong. There was no answer. The guy was dropped off by his wife or his girlfriend or whatever assuming that he was going to ride his motorcycle back home. Anyway, since I couldn't get in touch with Gary, couldn't get in touch with Mr. Wong, I took it upon myself to drive the truck to drop this guy off. He's a friend of the family. I drop him off. I take him to Lanakila. The truck started overheating going up. . . .
. . . .
. . . [T]here's a hill going up to the back side of [Lanakila] housing, and the truck totally died off. It overheated. It was smoking, steaming, and it wouldn't start.
It's at that point that I told myself, well  see, I was raised kind of old school. If you borrow something or you use somebody's property and you break it, you fix it. Assuming  you know, I thought, well, I broke this thing, so I need to fix it.
I called up Gary. I told him the problem with the truck, and he said, Okay, just bring it back as soon as you can. Couldn't get it fixed right away. Didn't know exactly what the problem was. The next day I had a friend look at it. He said it was the water pump. Might be some other things, but it's going to take a while. I called Gary again. I even left messages at the shop. I called him many times. In the interim prior to bringing the truck back, they knew where I worked.
Gary has stayed at my house many times. He used to go with my niece when my niece was living with me. So he knew how to get in touch with me, how to find me, how to contact me. But they never did. It was always me calling them.
Ellswick testified that at the time, he was working at two jobs. Because he was busy and the truck was not a high priority, "it must have been weeks" before he brought the truck to a friend in Kalihi to look at. Ellswick stated that he never intended to operate the truck without TLC's permission, and he thought that by keeping in touch with Gary and Wong about the status of the truck, everything was okay. Ellswick stated that he was interested in buying the truck, had discussed it with Wong, who had offered to sell it for $750, but needed time to get the money.
Ellswick testified that on the day he was arrested at the Chevron station, he had taken "off early from [his] other job just so [he] could work on this truck to get it running to take it back because [he] told [himself] enough is enough." En route to the TLC shop in Mapunapuna, the truck overheated near the First Hawaiian Bank on North King Street. Ellswick stated that he was able to get the truck started with a can of starting fluid from a nearby auto parts store but that at the bottom of the hill on the Fort Shafter/Middle Street overpass, the truck engine died again. Fortunately, the truck had enough momentum to go up the hill, cross the overpass, and go down into Mapunapuna, into the Chevron station. The bottom line, Ellswick said, was that the truck could not run and he had no way to get it back to Wong without fixing it.
On cross-examination, Ellswick testified that after the truck overheated on March 13, 2006, he took it to a friend in Kalihi to be fixed and did not see the truck for four weeks. During that time, he had been too busy to check on the truck. He believed that he was authorized to have the truck in his possession. When he spoke with Wong the day after he took the truck, Wong told him "to bring the truck back." Ellswick said he told Wong that "it can't drive. As soon as I fix it, I'll bring it back." Ellswick spoke to Wong again the following day and was again told by Wong to return the truck. Ellswick said he knew that Wong wanted the truck back. However, Ellswick never offered to have the truck towed to Wong's shop and Wong "never asked me to have it towed either. I guess he just wanted me to fix it. That's what I assumed." Ellswick testified that he "had no idea that maybe [the truck] was broken before[,]" but assumed that since he broke it, he had to fix it.
According to Ellswick, a couple of weeks after he took the truck, Wong told him that he would call the police if the truck was not returned. Ellswick denied that he was ever told that Wong had called the police. Ellswick also testified that right after Easter, he retrieved the truck from the friend who was supposed to repair it and took it to the shop he worked at in Kalihi. He slept in the truck for four nights instead of going home to `Ewa Beach before finally taking the truck to the Chevron stat ion.
At the settling of jury instructions on February 22, 2 007, Ellswick's attorney requested the ignorance-or-mistake-offact instruction that is included in the Hawaii Jury Instructions  Criminal (HAWJIC) as Instruction 7.13. Ellswick's attorney argued that this instruction was warranted based on the conflicting testimony at trial because although Ellswick believed he had permission to possess the truck, if he did not have permission, he was mistaken in thinking he had permission. The State objected, arguing that "it's the ignorance of mistake that [Ellswick] had permission from the actual owner that would require this instruction, and there has been no such evidence presented." The ignorance-or-mistake-of-fact instruction was not read to the jury.
On February 22, 2007, the jury returned a verdict of guilty as charged. . On November 14, 2007, Ellswick was sentenced to five years' imprisonment, with a mandatory minimum of one year and eight months.

DISCUSSION

A.
"[A] defendant is entitled to an instruction on every defense or theory of defense having any support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be. Moreover, it is the trial judge's duty to insure that the jury instructions cogently explain the law applicable to the facts of the case and that the jury has proper guidance in its consideration of the issues before it." State v. Locquiao, 100 Hawai'i 195, 205, 58 P.3d 1242, 1252 (2002) (internal quotation marks and citation omitted).
The standard of review when the omission of a juryinstruction is at issue on appeal is "whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Nichols, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006).
[O]nce instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.
Id. at 337, 141 P.3d at 984.

B.
HRS § 708-836(1) (Supp. 2007) provides, as it did at the time of the offense, in relevant part, that "[a] person commits the offense of [UCPV] if the person intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent!.]" "Owner" is defined, for purposes of HRS § 708-836, as "the registered owner of the propelled vehicle or the unrecorded owner of the vehicle pending transfer of ownership; provided that if there is no registered owner of the propelled vehicle or unrecorded owner of the vehicle pending transfer of ownership, `owner' means the legal owner." HRS § 708-836(4). The Hawai'i Supreme Court has stated that
the elements of the relevant iteration of HRS § 708-836 are (1) the person's conduct of exerting control over a thing by operating it, (2) the attendant circumstance of the thing being "another's" (i.e., the registered owner's) propelled vehicle, and (3) the attendant circumstance of the person's control/operation being without the registered owner's consent [.]
State v. Mainaaupo, 117 Hawai'i 235, 249, 178 P.3d 1, 15 (2008). The supreme court concluded in Mainaaupo that the intentional or knowing state of mind applies to the authorization element of the UCPV offense and therefore, a defendant prosecuted for the offense
may assert the mistake-of-fact defense with respect to the authorization element, where he [or she] claims that he [or she] mistakenly believed that the person who authorized his [or her] operation of the vehicle was the vehicle's registered owner, because such a belief would potentially "negative the state of mind required to establish the authorization element of the offense."
Id. at 251, 178 P.3d at 17 (brackets omitted).
In this case, the evidence adduced at trial indicated that the truck was registered to TLC. There is evidence in the record on appeal, particularly the transcripts of the trial proceedings, to support Ellswick's argument that he mistakenly believed that he was authorized to operate the truck and return it when it was repaired. For example, there was testimony that Wong, TLC's owner, left his son, Gary, in charge of the shop on March 13, 2006 and that Gary later put Ellswick in charge of the shop. Ellswick could infer, based on Gary's conduct, that when Gary put Ellswick in charge of the shop, Ellswick also had control of the truck and could use it to take a customer home. Ellswick testified on direct examination that he believed he had permission to use the truck, and on cross-examination, he testified that he believed he was authorized to use the truck, and his belief that he was authorized to use the truck, mistaken though it might have been, could potentially negate the intentional or knowing state of mind required for the authorization element of UCPV. Therefore, the jury should have been instructed on this defense. Locquiao, 100 Hawai'i at 205, 58 P.3d at 1252.

C.
Although Ellswick did not request an instruction on the affirmative defense of authorization by an agent with apparent authority pursuant to HRS § 708-836(3)(a),[2] he contends on appeal that the circuit court erred in failing sua sponte to give the jury such an instruction.
In light of our disposition of this appeal, we need not address this contention.

CONCLUSION
In light of the foregoing discussion, we vacate the judgment convicting Ellswick of one count of UCPV and remand this case for a new trial.
NOTES
[1] The Honorable Dexter D. Del Rosario presided.
[2] HRS § 708-836 (3) (a) provides, in relevant part:

It is an affirmative defense to a prosecution under this section that the defendant:
(a) Received authorization to use the vehicle from an agent of the owner where the agent had actual or apparent authority to authorize such use [.]