**Electronically Filed
Supreme Court
SCWC-30161
19-AUG-2013
08:30 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

STATE OF HAWAIʻI, Petitioner/Plaintiff-Appellee,

vs.

PAMELA L. TAYLOR, Respondent/Defendant-Appellant.

_____

SCWC-30161

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 30161; CR. NO. 08-1-0331)

AUGUST 19, 2013

RECKTENWALD, C.J., NAKAYAMA AND MCKENNA, JJ.,
AND CIRCUIT JUDGE GARIBALDI, ASSIGNED BY REASON OF VACANCY;
WITH ACOBA, J., CONCURRING AND DISSENTING SEPARATELY

AMENDED OPINION OF THE COURT BY MCKENNA, J.

## I. Introduction

The State asks us in this appeal to overrule the plurality opinion in State v. Stenger, 122 Hawaiʻi 271, 226 P.3d 441 (2010). Despite the apparent confusion regarding its actual holding, Stenger does not stand for the proposition for which it is sometimes cited; therefore, we decline to overrule Stenger. "[A] court should not overrule its earlier decisions unless the

most cogent reasons and inescapable logic require it." Johnston v. KFC Nat'l Mgmt. Co., 71 Haw. 229, 233, 788 P.2d 159, 161 (1990) (internal quotations and citations omitted). Due to the confusion, however, we do take the opportunity to clarify Stenger's holding.

Since Stenger's publication, our appellate courts have interpreted the case inconsistently. A dissent to one of our dispositions notes that Stenger held that a trial court has a duty to sua sponte give a jury instruction on a defense that the defendant has not asked for, where there is some evidence supporting the defense, no matter how weak, inconclusive, or unsatisfactory the evidence may be. See, e.g., State v. Pang, No. 29003 (Haw. Aug. 30, 2010) (dissent to order rejecting application for writ of certiorari) at 1. Many of the Intermediate Court of Appeals' ("ICA") dispositions note that Stenger held that the trial court has a limited duty to sua sponte instruct the jury on a particular defense only if (1) it appears that the defendant is relying on such a defense, or (2) if there is substantial evidence supportive of such a defense, and the defense is not inconsistent with the defendant's theory of the case, citing the alternative standard that Chief Justice Moon suggested in dissent. Stenger, 122 Hawaiʻi at 299, 226 P.3d at 469 (Moon, C.J., dissenting). See, e.g., State v. Yue, No.

2

29141 (App. Sept. 23, 2010)(SDO) at 7; State v. Metcalfe, No. 30518 (App. Mar. 30, 2012)(mem.) at 15; State v. Mabson, No. 29386, (App. Sept. 28, 2011)(SDO) at 3.  Even though unpublished dispositions of the appellate courts are "not precedent," they may nonetheless be "cited for persuasive value."  Hawaiʻi Rules of Appellate Procedure Rule 35(c)(2)(2010).  Hence, the need for clarity is apparent.

In the process of clarifying Stenger, we also reexamine our holding in State v. Nichols, 111 Hawaiʻi 327, 141 P.3d 974 (2006).  It is this court's duty to revisit our legal rules from time to time, as circumstances demand:

> Blind adherence to legal rules constitutes an abrogation of the judicial function.  Such blind adherence may result as much from adoption of a rule without adequate analysis as from application of a precedent without examination of its claim to validity.  Legal rules should result from, rather than be a substitute for, legal analysis.  Judicial rumination of ideas in a multitude of factual circumstances gives birth to rules.  And continued rumination insures that such rules will be applied only as long as they serve the function for which they were designed.

Columbia Casualty Co. v. Hoohuli, 50 Haw. 212, 217, 437 P.2d 99, 104 (1968).  On the issue of how appellate courts are to review the impact of an unrequested mistake of fact jury instruction, denominated as error for the first time on appeal, we clarify and hold that such error is to be reviewed first for plain error.  In the case of an unrequested mistake of fact jury instruction, plain error exists if the defendant, at trial, had met his or her initial burden to adduce credible evidence of facts constituting

3

the defense (unless those facts are supplied by the prosecution's witnesses).  See Stenger, 122 Hawai'i at 280, 226 P.3d at 450 (citing State v. Locquiao, 100 Hawai'i 195, 206, 58 P.3d 1242, 1253 (2002) and the Commentary to Hawai'i Revised Statutes ("HRS") § 701-115 (1993)).  If the omission of the unrequested mistake of fact jury instruction constitutes plain error, it shall be a basis for reversal of the defendant's conviction only if an examination of the record as a whole reveals that the error was not harmless beyond a reasonable doubt.

## II.  Background

### A.  The Trial[1]

Respondent/Defendant-Appellant Pamela Taylor was charged by Felony Information and Non-Felony Complaint with Theft in the Second Degree, in violation of HRS §§ 708-830(2) (1993)[2] and 708-831(1)(b) (1993)[3] (Count I); and  Unauthorized Practice of Law, in violation of HRS §§ 605-14[4] and -17 (1993 & Supp. 2007)[5]

---

[1]     The Honorable Dexter D. Del Rosario presided.

[2]     At the time of the alleged offense, as it does now, HRS § 708-830(2) provided that "[a] person commits theft if the person . . . obtains, or exerts control over, the property of another by deception with intent to deprive the other of the property."

[3]   At the time of the alleged offense, as it does now, HRS § 708-831(1)(b) provided that "[a] person commits the offense of theft in the second degree if the person commits theft . . . [o]f property or services the value of which exceeds $300[.]"

[4]   At the time of the alleged offense, as it does now, HRS § 605-14 provided:
           Unauthorized practice of law prohibited.  It shall be
           unlawful for any person, firm, association, or corporation
                                        (continued . . . )

4

(Count II). The charges stemmed from a period of time in February 2007 in which Taylor allegedly offered to provide legal services to Mariko Bereday, and subsequently obtained or exerted control over a retainer check for $7,000.00 by deception.

Taylor defended against these allegations by asserting that she herself was a victim of deception. She testified she believed she was offering legal services to Bereday on behalf of Ismael Serna Lara[6] and Damon Roth, two individuals she assumed were lawyers working for a firm called Legal Associate Services, Inc., LLC.

The complaining witness, Mariko Bereday, testified to the events leading up to Taylor's prosecution as follows. Bereday's friend had referred Taylor to her as an attorney. When Taylor went to Bereday's home for their first meeting, Taylor stated she was previously a federal public defender but was currently an attorney working at a 35-person law firm.

---

(. . . continued)
to engage in or attempt to engage in or to offer to engage in the practice of law, or to do or attempt to do or offer to do any act constituting the practice of law, except and to the extent that the person, firm, or association is licensed or authorized so to do by an appropriate court, agency, or office or by a statute of the State or of the United States. Nothing in sections 605-14 to 605-17 contained shall be construed to prohibit the preparation or use by any party to a transaction of any legal or business form or document used in the transaction.

[5] At the time of the alleged offense, as it does now, HRS § 605-17 provided that a violation of HRS § 605-14 is a misdemeanor. Taylor was acquitted on the Unauthorized Practice of Law count.

[6] Serna Lara was named as a co-defendant in the information and complaint but could not be located for trial.

Taylor went to Bereday's home again with a retainer agreement, which Bereday did not sign, and asked for a $30,000 retainer. Because Bereday could only afford $7,000, she wrote out a check in that amount, with the payee line blank at Taylor's direction. The very next day, Taylor called her from the bank where Taylor was attempting to cash the check. Bereday asked Taylor why the check had to be cashed, and Taylor stated that her boss wanted to make sure Bereday's money was good.

That morning, $7,000.00 was drawn on Bereday's account. Bereday later became suspicious and asked the bank to see the copy of the check. Bereday was surprised to see Serna Lara's name on the payee line, having never dealt with him.

After learning that there was no such law firm as Legal Associate Services, Inc., LLC and that Taylor was not an attorney, Bereday confronted Taylor and demanded her money back. Taylor returned to Bereday's home with a Capitol One check for $7,000.00 with Taylor's "law number" written on it. The check turned out to be a "bogus" check not connected to any checking account. Bereday never got her money back.

Other witnesses for the State testified consistently with Bereday's testimony. Julie Tablit, a customer service manager at the Kapolei Branch of Central Pacific Bank ("CPB"), testified that Taylor took the lead in attempting to cash Bereday's

6

$7,000.00 check. Tablit testified that a male and a female (whom she later positively identified through photographic line-ups as Serna Lara and Taylor, respectively) presented a questionable check to one of the bank tellers. The teller called Tablit over because the check amount was over her cashing limit, and Tablit spoke with Taylor, who stated that the check was for "payment or service that was rendered to Ms. Bereday." Tablit attempted to speak with Serna Lara, but Taylor informed her that he did not speak English. According to Tablit, Serna Lara did not do anything or say anything during the five minutes that Tablit and Taylor spoke. That day, Tablit also confirmed Serna Lara's identity through his Hawaiʻi drivers license. Serna Lara also inked his thumbprint upon the check, per bank procedures. Tablit could not reach Bereday by phone, so she refused to cash the check and directed Taylor and Serna Lara to the Kahala Times Supermarket in-store branch of CPB, Bereday's home branch, for further action.

Stephanie Hirayama, the manager of that branch, testified that a male and a female (whom she did not rule out in a later photographic lineup as Serna Lara and Taylor), came in to cash the $7,000.00 check. Even though Serna Lara was the payee, Taylor did all the talking. Hirayama testified that Bereday, by

phone, authorized her to cash the check, and that Taylor was the one who took the $7,000.00 cash off the counter.

Glenn Taniguchi, an accountant and attorney who had a long-standing professional relationship with Bereday, testified that he also discovered Taylor was not listed in the bar directory. When he confronted Taylor with that fact, Taylor told him she was listed under her maiden name, Pamela Merch. Taniguchi confirmed that a "Pamela Merch" was an inactive attorney. Unable to reach Merch under the Maryland telephone number in the bar directory, Taniguchi abandoned his efforts to confirm Taylor's credentials. Taniguchi later demanded that Taylor return the $7,000.00 in the form of a cashier's check or cash to Bereday by a date certain, which Taylor agreed to do but did not do. Instead, Bereday received the bogus $7,000.00 check from Taylor.

Although the State provided no evidence concerning Roth, the State did provide evidence that there was no such business entity by the name of Legal Associate Services, Inc., LLC, and that Serna Lara was not an attorney.

Testimony regarding Serna Lara came from David Wong, the owner-operator of the former Mountain View Dairy in Waiʻanae. He testified that Serna Lara had been a full-time cow-milker for about ten years at the time of the alleged theft. Wong testified that Serna Lara lived in the employee housing complex on-site.

8

Wong stated that he had seen Taylor at Serna Lara's home before. Wong testified that Serna Lara was not a licensed attorney, did not work for a law firm, did not run a law office out of his employee housing, and never mentioned anything about working at a law firm. Put plainly, Serna Lara was "[j]ust a milker."

Taylor testified in her own defense. She testified that she graduated from the David A. Clarke School of Law in Washington, D.C. in 1998, moved to Hawaiʻi in 2000, but never took the Hawaiʻi bar exam. Taylor never disputed that she was not licensed to practice law in Hawaiʻi. Taylor denied telling Bereday or Taniguchi she was an attorney.

Taylor testified generally that she took direction from Serna Lara and Roth. Taylor testified that Bereday spoke by phone with Roth multiple times and directed that her $7,000.00 check be turned over to Roth. Unable to reach Roth, Taylor instead turned the check over to Serna Lara and later met up with him at the Kapolei CPB branch. After Tablit refused to cash the check, Taylor and Serna Lara went to the Kahala CPB branch, where Hirayama cashed the check and handed the money to Serna Lara. Taylor testified that she never touched the money and did not know what happened to the $7,000.00 in cash.

Taylor testified that Serna Lara instructed her to visit Bereday's home again to deliver a receipt for the check and other

9

paperwork.  After Bereday demanded a refund of the $7,000.00, Serna Lara became "infuriated," wrote out a refund check, and directed Taylor to deliver the check to Bereday, which Taylor did.

Taylor testified that she believed Serna Lara and Roth were attorneys because she met them through a mutual attorney friend, Pamela Merch.  She said she believed Roth was an attorney because he did not agree to meet with Taylor until Merch was on-island to make the formal introduction at Roth's Queen Street office.  She allegedly believed Serna Lara was an attorney because when she met him, he was "professional-looking" and "average articulate" in his use of English.  Taylor testified that she filled out a job application, was hired by Roth and Serna Lara in 2006, did clerical work for both, and was paid by check per assignment.

She testified that she had visited Serna Lara at the dairy farm, and he explained that "he was an overseer of a set of the farmers," a job he held in addition to his work as an attorney at the law firm.  On cross-examination, the State pointed out photographic evidence that Serna Lara was not dressed professionally (i.e., he was dressed in a shirt and shorts) when he and Taylor attempted to cash the check on a regular business day in the middle of the day.  Taylor testified that she did not find his manner of dress curious.

She testified that she did not know Roth and Serna Lara were not attorneys with a legitimate law firm.  Taylor testified that she understood the process of becoming a licensed attorney but never confirmed whether Serna Lara or Roth were licensed to practice law in Hawaiʻi.

The defense did not submit any jury instructions.  All of the court's jury instructions were given by agreement.  There was no instruction on mistake of fact.

The jury found Taylor guilty of theft in the second degree but acquitted her of unauthorized practice of law.  The trial court issued its Judgment of Conviction and Sentence, sentencing Taylor to five years of incarceration and restitution of $7,000.00 to Bereday.  Taylor timely appealed.

**B.  The Appeal**

For the first time on appeal, Taylor argued, "The trial court reversibly erred in *sua sponte* failing to instruct the jury on the mistake-of-fact defense as to Theft2-Deception." Specifically, Taylor argued that she was operating under the mistaken belief that she

> was acting on behalf of attorneys Serna Lara and Roth. . . . Since Taylor was mistaken as to the facts that Roth and Serna Lara (1) were not attorneys, (2) were not members of a 35-person law firm, and (3) were ineligible to practice law, she was entitled to a "mistake of fact" instruction.  In other words, Taylor did not commit Theft2 by deception because she did not accept Bereday's check, knowing that Roth and Serna Lara intended to take the money without rendering legal services to Bereday.

11

Taylor further cited to Stenger, 122 Hawaiʻi 271, 226 P.3d 441, which was decided after she was convicted, for the proposition that, where some evidence was adduced that the defendant was laboring under a mistake of fact that could negate the state of mind necessary to commit theft, the trial court was required to sua sponte instruct the jury on the mistake of fact defense, and the court's failure to so instruct the jury was not harmless beyond a reasonable doubt. Taylor concluded by requesting that the ICA vacate her Theft2-Deception conviction and remand the case for a new trial, with an order that the court instruct the jury on the mistake of fact defense.

The State's Answering Brief focused on Stenger. The State argued that Stenger was wrongly decided, for reasons set forth in the Stenger dissent, authored by Justice Nakayama and joined by Chief Justice Moon. Those reasons were that requiring a sua sponte mistake of fact jury instruction (1) requires the trial court to advocate for the criminal defendant by identifying, and therefore highlighting, all possible defenses to the jury; (2) implicitly requires that the State (in order to stave off automatic retrial) request an instruction on potentially all defenses that are supported by any piece of weak evidence in the record; and (3) incentivizes defense counsel not to request a mistake-of-fact instruction in order to "receive an automatic

12

retrial" when the issue is raised on appeal.  In conclusion, the State requested that the ICA affirm Taylor's conviction.

The ICA held, "Based on [Stenger], we conclude that the Circuit Court erred in failing to instruct the jury on Taylor's mistake-of-fact defense and that such error was not harmless beyond a reasonable doubt."  State v. Taylor, No. 30161 (App. Feb. 29, 2010)(SDO) at 2.  The ICA therefore vacated the trial court's judgment of conviction and sentence and remanded the case for a new trial on the charge of second-degree theft by deception.  See id.

The State now renews its request that this court overrule Stenger.

## III.  Discussion

### A.  The Mistake of Fact Defense

Taylor was charged with Theft in the Second Degree, by Deception, in violation of HRS § 708-830(2), which states, "A person commits theft if the person . . . obtains, or exerts control over, the property of another by deception with intent to deprive the other of the property," and in violation of HRS § 708-831(1)(b), the value of the property or services having exceeded $300.  "Deception" is further defined, in relevant part, in HRS § 708-800 (1993) as knowingly "[c]reat[ing] or confirm[ing] another's impression which is false and which the

13

defendant does not believe to be true," "[f]ail[ing] to correct a false impression which the person previously has created or confirmed," or "[p]romis[ing] performance which the person does not intend to perform or knows will not be performed. . . ."

Mistake of fact can be a defense to Theft in the Second Degree. This defense is provided by statute:

> **Ignorance or mistake as a defense.** In any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if:
> (1) The ignorance or mistake <u>negatives the state of mind required to establish an element of the offense</u>; or
> (2) The law defining the offense or a law related thereto provides that the state of mind established by such ignorance or mistake constitutes a defense.

HRS § 702-218 (1993) (emphasis added).

## B. **State v. Stenger**

Our most recent case expounding on mistake of fact instructional error is Stenger, 122 Hawaiʻi 271, 226 P.3d 441. In that case, Petitioner/Defendant-Appellant Angela Stenger was charged and convicted of Theft in the First Degree for allegedly taking $23,034 in welfare benefit overpayments. 122 Hawaiʻi at 276, 226 P.3d at 446. The State alleged that Stenger obtained the overpayments by deceiving the Department of Human Services ("DHS") when she failed to report that her children were not living with her and failed to report her income from substitute teaching, from her surf school, and via inheritance. 122 Hawaiʻi at 275-76, 226 P.3d at 445-46. At trial, Stenger requested a

14

claim of right instruction on the basis that Stenger "believed she was entitled to the benefits that she obtained and exerted control over[.]" 122 Hawaiʻi at 276, 226 P.3d at 446. The trial court denied the request. Id.

Stenger appealed her conviction to the ICA, arguing that the trial court erred by refusing to give the requested claim of right instruction and "fail[ed] sua sponte to give a mistake-of-fact instruction[.]" Id. In other words, Stenger raised the lack of an explicit mistake of fact instruction for the first time before the ICA. The ICA vacated the trial court's judgment of conviction and remanded Stenger's case for a new trial. 122 Hawaiʻi at 277, 226 P.3d at 447. It held that the trial court erred in denying Stenger's requested claim of right instruction. 122 Hawaiʻi at 276-77, 226 P.3d at 446-47. It also held that Stenger was not entitled to a mistake of fact instruction because her claimed mistake concerned what she was required to report, which the ICA considered to be a mistake of law and no defense. 122 Hawaiʻi at 277, 226 P.3d at 447.

On certiorari, Stenger pressed the mistake of fact issue, arguing that the ICA gravely erred in concluding she was not entitled to the instruction. Id. Stenger acknowledged that she did not request an explicit mistake of fact instruction at trial, but she argued that the evidence adduced at trial supported the

15

instruction, and that the trial court's failure to give the instruction was not harmless beyond a reasonable doubt. Id. Stenger argued that she labored under the following mistake of fact: "if she believed she was complying with the reporting requirements by virtue of the items she did report to DHS, then she could not have 'knowingly' created or failed to correct a false impression." 122 Hawaiʻi at 280, 226 P.3d at 450.

A plurality of this court agreed with Stenger. The plurality concluded that the trial court's "failure to instruct on the defense of mistake of fact" was not harmless beyond a reasonable doubt because there was a "reasonable possibility that the jury, if provided with a separate mistake of fact instruction, could have found that [Stenger] believed she complied with the reporting requirements and, thus, did not knowingly deceive DHS." 122 Hawaiʻi at 282-83, 226 P.3d at 452-53 (following the analytical framework set forth in Nichols, 111 Hawaiʻi 327, 141 P.3d at 974).

In reaching this conclusion, the Stenger plurality first favorably cited Locquiao, 100 Hawaiʻi at 206, 58 P.3d at 1253 and the commentary to HRS § 701-115 for the following proposition:

> With respect to defenses that negate penal liability, the defendant has the initial burden to adduce 'credible evidence of facts constituting the defenses, unless those facts are supplied by the prosecution's witnesses.'

122 Hawaiʻi at 280, 226 P.3d at 450.

16

The plurality noted that <u>Locquiao</u> held that "where a defendant has adduced evidence at trial supporting an instruction on the statutory defense of ignorance or mistake of fact, the trial court must, <u>at the defendant's request</u>, separately instruct as to the defense, notwithstanding that the trial court has also instructed regarding the state of mind requisite to the charged offense." 122 Hawaiʻi at 281, 226 P.3d at 451 (citing <u>Locquiao</u>, 100 Hawaiʻi at 208, 58 P.3d at 1255) (emphasis added)). This is so, "no matter how weak, inconclusive, or unsatisfactory the evidence [as to the defendant's mistake of fact] may be." 122 Hawaiʻi at 281, 226 P.3d at 451. <u>See</u> <u>also</u> <u>State v. Stocker</u>, 90 Hawaiʻi 85, 94 n.10, 976 P.2d 399, 408 n.10 (1999) ("To meet his [or her] initial burden of production [on a non-affirmative defense, including mistake of fact], the defendant need only come forward with "'some' evidence, 'no matter how weak, inconclusive, or unsatisfactory the evidence may be.'")

It was no accident that the plurality turned to <u>Locquiao</u>, a case involving a mistake of fact instruction <u>requested</u> by the defendant at trial but denied by the trial court. Stenger argued that she "did request a claim of right instruction, which is a subspecies of mistake of fact, and, therefore, . . . that request should be construed liberally to encompass a request for mistake of fact." 122 Hawaiʻi at 281 n.13, 226 P.3d at 451 n.13. The

17

Stenger plurality construed Stenger's mistake of fact instruction to have been "requested" by the defendant at trial as "encompass[ed]" in her request for a claim of right instruction. 122 Hawaiʻi at 284, 226 P.3d at 454.

The plurality explained that the claim of right defense is a "particular type of mistake of fact that would be logically encompassed under a general mistake of fact instruction."  Id. Specifically, a claim of right instruction would be appropriate where the defendant asserts "(1) some form of pre-existing ownership or possession of (2) specific property."  122 Hawaiʻi at 285, 226 P.3d at 455.  Based on the evidence presented, the Stenger plurality concluded that it was a mistake of fact defense Stenger asserted at trial, not a claim of right defense.  Id.

As Judge Kim emphasized in his concurrence, "I would contend that . . . the defense in the instant case did essentially request a jury instruction on the mistake of fact defense when it mistakenly requested one on claim of right. . . . In effect, the defense had the theory right, but the specific instruction wrong, and the trial court, while correctly recognizing the latter, mistakenly failed to recognize the former[.]"  122 Hawaiʻi at 296, 226 P.3d at 466 (Kim, J., concurring) (emphasis added).  One of the dissents recognized that, had Stenger explicitly requested the mistake of fact jury instruction, under Locquiao, the trial

18

court would have been required to so instruct.  122 Hawaiʻi at 300 n.1, 226 P.3d at 470 n.1 (Nakayama, J., dissenting)

The Stenger plurality could have expressly stated that a trial court has a duty to correct an erroneous request for a jury instruction where the theory of the defense clearly implicates another jury instruction.  See State v. Faria, 100 Hawaiʻi 383, 390, 60 P.3d 333, 340 (2002) ("[F]aced with inaccurate or incomplete instructions, the trial court has a duty to, with the aid of counsel, either correct the defective instructions or to otherwise incorporate it into its own instructions."); State v. Vanstory, 91 Hawaiʻi 33, 42, 979 P.2d 1059, 1068 (1999) ("If the instructions requested by the parties are inaccurate or incomplete but are necessary 'in order for the jury to "have a clear and correct understanding of what it is that they are to decide[,]"' then the trial court has the duty either to correct any defects or to fashion its own instructions.") (citing State v. Okumura, 78 Hawaiʻi 383, 411, 894 P.2d 80, 108 (1995)); State v. Sawyer, 88 Hawaiʻi 325, 330, 966 P.2d 637, 642 (1998) (same).

Upon review, then, Stenger actually determined that (1) a trial court has a duty to properly instruct the jury on mistake of fact in the face of a requested but erroneous jury instruction on claim of right; and (2) the mistake of fact jury instruction was further required to be given because the defendant

19

"requested" it and raised some evidence in support of the defense. Read this way, Stenger did not actually disrupt our instructional error precedent to the extent feared by the dissent in that case. See 122 Hawaiʻi at 306, 226 P.3d at 476 (Nakayama, J., dissenting) (interpreting Stenger to require a trial court to "instruct the jury sua sponte as to all defense instructions that may possibly be implicated by the facts"). Read this way, it also would not have been necessary for Chief Justice Moon to propose an alternative test, which has since been inconsistently adopted by the ICA in appeals raising instructional error. See 122 Hawaiʻi at 298, 299, 226 P.3d at 468, 469 (Moon, C.J., dissenting) ("[T]he trial court has a limited duty to sua sponte instruct the jury on a particular defense if (1) it appears that the defendant is relying on such a defense, or (2) if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.") (citing People v. Barton, 906 P.2d 531, 535 (Cal. 1995)). Rather, as to requested jury instructions, Stenger reaffirmed the trial court's duty to correct erroneously requested jury instructions, and reaffirmed that a defendant is entitled to a requested jury instruction on a defense when he presents some evidence going to the defense.

20

## C.  State v. Nichols

Thus, Stenger does not stand for the proposition that it has become cited for:  that a trial court errs in failing to sua sponte give a jury instruction unrequested by the defendant at trial; Nichols, however, does.  111 Hawaiʻi 327, 141 P.3d 974.  Thus, Nichols is actually dispositive of Taylor's appeal, and we take the opportunity to revisit that case.  In Nichols, the defendant ("Nichols") was charged with and convicted of Terroristic Threatening in the First Degree in violation of HRS § 707-716(1)(c) (1993).  111 Hawaiʻi at 328-29, 141 P.3d at 975-76.

On certiorari, Nichols argued, inter alia, that the trial court erred in not instructing the jury that they could compare the "relevant attributes" between him and the complaining witness (a police officer) to determine whether the complaining witness objectively, reasonably felt threatened.  111 Hawaiʻi at 329, 141 P.3d at 976.  As with Taylor, the error in Nichols was raised for the first time on appeal, as Nichols had not requested the instruction at trial, and no such instruction was given to the jury.  111 Hawaiʻi at 333, 339 n.7, 141 P.3d at 980, 986 n.7.

In reversing Nichols' conviction, this court held

> [A]lthough as a general matter forfeited assignments of
> error are to be reviewed under the [Hawaiʻi Rules of Penal

21

> Procedure ("HRPP")] Rule 52(b)[7] plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a)[8] harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.,* that the erroneous jury instruction was not harmless beyond a reasonable doubt.

111 Hawaiʻi at 337, 141 P.3d at 984. We stated the new "merger" rule "flow[ed] from this court's holding in Haanio[9] that the duty to instruct the jury ultimately lies with the trial court[.]" 111 Hawaiʻi at 335-36, 141 P.3d at 982-83 (footnote omitted).

We reiterate that it is the trial court's duty to properly instruct the jury. However, in the case of a jury

---

[7]   Under HRPP Rule 52(b) (1977), "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

[8]   Under HRPP Rule 52(a) (1977), "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

[9]   Upon further review, however, State v. Haanio, 94 Hawaiʻi 405, 16 P.3d 246 (2001), did not necessarily compel the holding in Nichols, which Stenger adopted. Stenger, 122 Hawaiʻi at 281, 226 P.3d at 451. Haanio held "that trial courts must instruct juries as to any included offenses when 'there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense[.]'" Haanio, 94 Hawaiʻi at 413, 16 P.3d at 254. This is so "despite any objection by the defense, and even in the absence of a request from the prosecution." Id. In other words, "trial courts are duty bound to instruct juries 'sua sponte . . . regarding lesser included offenses' . . . having a rational basis in the evidence." 94 Hawaiʻi at 415, 16 P.3d at 256 (citation omitted).
   There is a clear difference between requiring sua sponte jury instructions on lesser included offenses versus defenses, in terms of the burden upon the trial court, and in terms of the effect upon trial strategy. See, e.g., State v. Auld, 114 Hawaiʻi 135, 148, 149, 157 P.3d 574, 587, 588 (App. 2007) ("A rule requiring the court to give a self-defense instruction even if deliberately not requested by the defense would put the trial court in a difficult position . . . Permitting a defendant to exercise a measure of strategic control over whether the jury is instructed on self-defense . . . would simply allow the defendant to focus the jury's attention. . . .") (Nakamura, J., concurring and dissenting).

instruction that is not requested at trial, the omission of which is later denominated as error for the first time on appeal, the Nichols' "merger" holding should also be clarified.

Upon further examination of this case, it appears that the Nichols court, despite its "merger" holding, continued to engage in a two-step, plain-error-then-harmless error review in analyzing instructional error. Nichols observed that the defendant must first overcome the presumption that the instructions as given were correct. 111 Hawaiʻi at 337 n.6, 141 P.3d at 984 n.6. Once instructional error is demonstrated, the defendant must then show that that there was a reasonable possibility that the erroneous jury instruction contributed to his or her conviction, *i.e.,* that the instructional error was not harmless beyond a reasonable doubt. See 111 Hawaiʻi at 337, 141 P.3d at 984.

The first step in the Nichols analysis was our determination that "the circuit court's failure to give a 'relevant attributes' instruction was plain error[.]" 111 Hawaiʻi at 338, 141 P.3d at 985 (emphasis added). This was so because under State v. Valdivia, the failure to instruct on relevant attributes in a terroristic threatening case is reversible error in any event, whether or not the relevant attributes instruction is requested (as it was in Valdivia) or unrequested (as it was in Nichols).

23

95 Hawaiʻi 465, 479, 24 P.3d 661, 675 (2001) (concluding that the omission of an instruction on relevant attributes was error because "the jury . . . should have been instructed that it could consider relevant attributes of both the defendant and the [complaining witness] in determining whether the [complaining witness's] fear of bodily injury . . . was objectively reasonable under the circumstances. . . .")

The next step in the Nichols analysis was our determination that "there is a reasonable possibility that the error contributed to Nichol's conviction, *i.e.*, the error was not harmless beyond a reasonable doubt." 111 Hawaiʻi at 338, 141 P.3d at 985 (emphasis added). Thus, it would appear that, rather than "merging" the two standards of review, the Nichols court retained the two-step plain-error-then-harmless-error inquiry.

Thus, in the case of a mistake of fact jury instruction that is not requested and not given at trial, the omission of which is denominated as error for the first time on appeal, we clarify that the plain error standard continues to apply. Plain error exists "[i]f the substantial rights of the defendant have been affected adversely[.]" State v. Kikuta, 125 Hawaiʻi 78, 95, 253 P.3d 639, 656 (2011). This court "will apply the plain error standard of review to correct errors [that] seriously affect the fairness, integrity, or public reputation of judicial

24

proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." Id. (citations omitted).

In the case of a jury instruction on mistake of fact that is not requested by the defense and not given by the trial court, plain error affecting substantial rights exists if the defendant had met his or her initial burden at trial of adducing credible[10] evidence of facts constituting the defense (or those facts are supplied by the prosecution's witnesses). See Stenger, 122 Hawaiʻi at 280, 226 P.3d at 450 (citing Locquiao, 100 Hawaiʻi at 206, 58 P.3d at 1253 and the Commentary to HRS § 701-115). See id.

We draw our holding from HRS § 701-115(2) and its Commentary. HRS § 701-115 (1993) provides:

---

[10]     By "credible" evidence we mean evidence "offering reasonable grounds for being believed." Webster's Ninth New Collegiate Dictionary 305 (1988). The Dissent defines "credible" to mean "not incredible, that is, not 'too extraordinary and improbable to be believed[.]'" Dissent at n.11 (citing Merriam Webster's Collegiate Dictionary 590 (10th ed. 1993)). Respectfully, we have already opined that evidence that is "not credible," as Taylor's was, could merely be "plausible (and, therefore, not incredible)," just not entirely believable." State v. Maelega, 80 Hawaiʻi 172, 178 n.9, 907 P.2d 758, 764 n.9 (1995).
        We are aware that "credibility" is usually associated with subjective believability. See, e.g., State v. West, 95 Hawaiʻi 452, 464, 24 P.3d 648, 660 (2001) ("[A]ppellate courts must objectively review all the evidence and avoid commenting on its subjective believability, especially the credibility of the witnesses.") Appellate courts are, however, sometimes required to employ credibility determinations. For example, "[w]hen an appellate court reviews the sufficiency of the evidence, it examines whether there was substantial evidence to support the conclusion of the trier of fact. . . . Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." State v. Gomes, 117 Hawaiʻi 218, 226, 177 P.3d 928, 936 (2008) (citation omitted). Thus, in the current context, we examine whether the defendant met her initial burden to adduce evidence with reasonable grounds for being believed.

25

> **Defenses**. (1) A defense is a fact or set of facts which negatives penal liability.
>
> (2) No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented. If such evidence is presented, then:
>
> (a)  If the defense is not an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in the light of any contrary prosecution evidence, raises a reasonable doubt as to the defendant's guilt; or
>
> (b)  If the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability.
>
> (3) A defense is an affirmative defense if:
>
> (a)  It is specifically so designated by the Code or another statute; or
>
> (b)  If the Code or another statute plainly requires the defendant to prove the defense by a preponderance of the evidence.

The Commentary to HRS § 701-115 provides, in full:

> The Code establishes two classes of defenses. As to both, it places an initial burden on the defendant to come forward with some credible evidence of facts constituting the defense, unless, of course, those facts are supplied by the prosecution's witnesses.
>
> As to the burden of persuasion, two different rules are codified. In the case of defenses which are not affirmative, the defendant need only raise a reasonable doubt as to the defendant's guilt.  The other side of the coin is that the prosecution must prove beyond a reasonable doubt facts negativing the defense. The prosecution in fact does this when the jury believes its case and disbelieves the defense.
>
> In the case of affirmative defenses, the burden on the defendant increases. Now the defendant must prove by a preponderance of the evidence facts which negative the defendant's penal liability. Subsection (4) defines "affirmative defense," making it clear that this type of defense needs special legislative prescription. Unless the Legislature has made a particular defense affirmative, the defendant's burden is only to raise a reasonable doubt.[11]

---

[11]     The dissent states that the majority "preemptively shifts the burden of persuasion to the defendant at a point in the litigation where the defendant is only required to satisfy the burden of production."  Dissent at V.B. However, the commentary actually states that the defendant must "come forward with some credible evidence of facts constituting the defense," and the phrase "come forward" clearly elaborates upon the statute's requirement that the defendant "present[]" "evidence of the specified fact or facts" before the

(continued . . . )

26

Contrary to the Dissent's assertion, <u>Maelega</u>, 80 Hawaiʻi 172, 907 P.2d 758, did not invalidate the Commentary to HRS § 701-115.  Dissent at VI.A.  In that case, the defendant ("Maelega"), who was tried for murder, requested a jury instruction on extreme mental and emotional disturbance ("EMED").  80 Hawaiʻi at 174, 907 P.2d at 760.  We observed that the requirement in <u>State v. Nobriga</u>, 10 Haw. App. 353, 359, 873 P.2d 110, 113 (1994), that the defendant come forward with credible evidence was inconsistent with this court's holding in <u>State v. Pinero</u>, 75 Haw. 282, 304, 859 P.2d 1369, 1379 (1993), that even "weak, inconclusive, or unsatisfactory" evidence supports the giving of a defense instruction.  That much remains true as to requested defense instructions, which Maelega's was.

The primary issue in <u>Maelega</u>, however, was not the meaning of the Commentary but whether the circuit court's modified instruction on the defendant's requested EMED defense, which included language drawn from the Commentary, impermissibly

---

(. . . continued)
trier of fact considers a defense.  In other words, "credible evidence" in the Commentary refers to the defendant's burden of production, not persuasion.  In fact, the next paragraph in the Commentary states the "burden of persuasion" is identified as belonging to the State or to the defendant, depending upon whether the defense is an affirmative or non-affirmative defense.  Thus, the Commentary still provides helpful guidance as to the defendant's burden of coming forward with credible evidence to constitute a defense.  Contrary to the Dissent's assertion, this interpretation of the Commentary to HRS § 701-115 is still viable.  Dissent at VI.A.  As recently as <u>Locquiao</u> and <u>Stenger</u>, we continued to favorably cite to the Commentary to HRS § 701-115.  <u>See</u> <u>Locquiao</u>, 100 Hawaiʻi at 206, 58 P.3d at 1253; <u>Stenger</u>, 122 Hawaiʻi at 280, 226 P.3d at 450.

27

shifted the burden of proof onto the defendant.  <u>Maelega</u>, 80 Hawaiʻi at 176, 907 P.2d at 762.  The modified instruction read as follows:

> The defense of extreme mental or emotional disturbance places *the initial burden on the defendant to come forward with some credible evidence of fact constituting a defense* unless those facts are supplied by the prosecution's witnesses.  *If this occurs*, the prosecution must then prove beyond a reasonable doubt that the defendant was not at the time of the offense under the influence of extreme mental or emotion [sic] disturbance for which there is a reasonable explanation.

80 Hawaiʻi at 176, 907 P.2d at 762 (emphasis in original).

We held that this instruction "impliedly instructed the jury that the burden under HRS § 701-115(2) was a question of fact for the jury to decide," i.e., that the jury was to decide whether Maelega came forward with some credible evidence of facts constituting the EMED defense.  80 Hawaiʻi at 177, 907 P.2d at 763.  We held that the circuit court should not have instructed the jury on Maelega's "burden of production. . . ."  <u>Id.</u>  Rather, the jury should have been instructed only as to the State's ultimate burden of persuasion to negative Maelega's EMED defense beyond a reasonable doubt.  <u>Id.</u>

We stated that it was not the jury's job to "conclude[] that Maelega's purported defense was not credible," because "it is not the province of the jury to second guess the judge's decision to instruct on EMED manslaughter. . . ."  80 Hawaiʻi at 178 n.9, 179 n.10, 907 P.2d at 764 n.9, 765 n.10.  Rather, we held that

28

whether the defendant's burden of production "has been met is a question that should be decided by the trial court as a matter of law." 80 Hawaiʻi 179 n.10, 907 P.2d at 765 n.10; see also 80 Hawaiʻi at 177 n.8, 907 P.2d at 763 n.8 (characterizing the trial court's determination that a defendant has met his initial burden of producing "some credible evidence of facts constituting the defense" as calling for a "legal conclusion."). In Maelega, we believed that the circuit court had, by giving the EMED instruction to the jury, "implicitly acknowledged that, based on the record, a reasonable juror could harbor a reasonable doubt as to whether Maelega acted while under an extreme emotional disturbance for which there was a reasonable explanation when he killed [the victim.]" 80 Hawaiʻi at 177, 907 P.2d at 763. Therefore, the role of the trial court in deciding to give a jury instruction on a requested non-affirmative defense is to resolve a question of law based on an objective juror standard.

Synthesizing and applying HRS § 701-115, its Commentary, and Maelega in the context of this case, we hold that, in the case of an unrequested mistake of fact jury instruction denominated as error for the first time on appeal, HRS § 701-115(2) and its accompanying Commentary place the burden of production on the defendant to present evidence of the specified fact or facts going to the defense. In other words, the defendant must have

29

come forward at trial with credible evidence of facts constituting the defense, unless those facts were supplied by the prosecution's witnesses.  Further, "credible evidence" in this context means that the circuit court should have concluded, based on the record that existed at trial, that the evidence "offered reasonable grounds for being believed," i.e., that "a reasonable juror could harbor a reasonable doubt" as to the defendant's guilt, and should have given the unrequested mistake of fact jury instruction.  Failure to give the mistake of fact jury instruction under these circumstances constitutes plain error.[12]

This is so, because a defense like mistake of fact is capable of "negativ[ing] the state of mind required to establish an element of the offense," thus capable of avoiding conviction. HRS § 702-218 (1993); see also HRS § 701-114(1)(b) (1993) ("[N]o person may be convicted of an offense unless the following are proved beyond a reasonable doubt: . . . The state of mind required to establish each element of the offense[.]").

This court may notice as plain error the omission of a mistake of fact jury instruction if it appears that the defendant

---

[12]    In this regard, we disagree with the Dissent that weak, inconclusive, or unsatisfactory evidence going to a particular defense is always "apparent" to the trial court in a bench or jury trial.  Dissent, Section V.A.  It is more likely the case that weak, inconclusive, or unsatisfactory evidence would become "apparently" relevant to a particular defense when the defendant requests the defense and the trial court's attention is drawn to such evidence in the record.  Absent such a request, due to its nature, weak, inconclusive, or unsatisfactory evidence relevant to an unstated defense may not necessarily take on any apparent significance during trial.

30

has come forward with credible[13] evidence going to the defense that the jury should have been able to consider, as such an error "seriously affects the fairness, integrity, or public reputation of judicial proceedings," and it would "serve the ends of justice" and "prevent the denial of fundamental rights" to address such an omission.  Kikuta, 125 Hawaiʻi at 95, 253 P.3d at 656.  In such an instance, where the omission of the mistake of fact jury instruction constitutes plain error, it shall be a basis for reversal of the defendant's conviction only if an examination of the record as a whole reveals that the error was not harmless beyond a reasonable doubt.

### D.  Taylor's Appeal

Turning to Taylor's appeal, the absence of a jury instruction on mistake of fact was not plain error, because Taylor had not met her initial burden of adducing credible[14] evidence of facts constituting the defense, and those facts were not supplied by the prosecution's witnesses.  Taylor's testimony that she believed Roth and Serna Lara were attorneys after she met them through Pamela Merch at their Queen Street office and worked for them in a clerical capacity for a year was not credible[15], in light of the evidence, as summarized above.

---

[13]   See supra note 10.

[14]   See supra note 10.

[15]   See supra note 10.

Therefore, the omission of the mistake of fact jury instruction at trial was not plain error. Even assuming arguendo that it was, there is no reasonable possibility that the omission of a mistake of fact instruction contributed to Taylor's conviction. In other words, the omission of the mistake of fact jury instruction was harmless beyond a reasonable doubt.

We therefore reverse the ICA's March 27, 2012 Judgment on Appeal, entered pursuant to its February 29, 2012 Summary Disposition Order, which vacated the October 7, 2009 Judgment and Conviction of the Circuit Court of the First Circuit and remanded this case for a new trial. Taylor's Judgment of Conviction and Sentence is affirmed.

Kimberly Tsumoto Guidry
for petitioner

Phyllis J. Hironaka
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Colette Y. Garibaldi